UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
DT, Individually, and on behalf of her  :    06 Civ. 2674 (WCC)
child JL,

                                        :

              Plaintiff,

                                        :

         - against -                         **OPINION**

                                        :    **AND ORDER**

SOMERS CENTRAL SCHOOL DISTRICT; SOMERS
CENTRAL SCHOOL DISTRICT BOARD OF        :
EDUCATION; RICHARD CLINCHY, Individually
and in his capacity as President of     :
Somers Central School District Board of
Education; JOANNE MARIEN, Individually  :
and in her capacity as Superintendent of
Schools; IRENE PERRELLA, Individually,  :
and in her capacity as acting School
Principal; LINDA HORISK, Individually,  :
and in her capacity as school Principal;
UNKNOWN STUDENTS 1-100; UNKNOWN TEACHERS:
1-100; UNKNOWN ADMINISTRATORS 1-100; and
UNKNOWN LUNCH AIDES 1-100,              :

              Defendants.  :
- - - - - - - - - - - - - - - - - - - - - X


**A P P E A R A N C E S :**

                          LAW OFFICE OF PETER D. HOFFMAN, PC
                          **Attorneys for Plaintiff**
                          200 Katonah Avenue
                          Katonah, New York 10536

PETER D. HOFFMAN, ESQ.

         Of Counsel


                          RUTHERFORD & CHRISTIE, LLP
                          **Attorneys for Defendants**
                          369 Lexington Avenue, 8th Floor
                          New York, New York 10017

LEWIS R. SILVERMAN, ESQ.
JULIE A. RIVERA, ESQ.

         Of Counsel


**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff DT[1] ("DT") brings this action on behalf of herself and her child, plaintiff JL ("JL" and, together with DT, the "plaintiffs"), pursuant to Title VI, 42 U.S.C. § 1983, the Equal Protection Clause, New York State Tort Law and New York State Human Rights Law, against Somers Central School District (the "School"); Somers Central School District Board of Education; Richard Clinchy ("Clinchy"), individually and in his capacity as President of Somers Central School District Board of Education; Joanne Marien ("Marien"), individually and in her capacity as Superintendent of Schools; Irene Perrella ("Perrella"), individually and in her capacity as acting school principal; and Linda Horisk ("Horisk"), individually and in her capacity as school principal (collectively, the "defendants").  Plaintiffs allege that JL suffered physical, mental, psychological and emotional harm due to a racially-charged educational environment and that JL was deprived of access to educational programs.  Defendants now move for summary judgment.  For the reasons set forth below, defendants' motion is granted in its entirety.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed for the purposes of this motion.

**I.    Ninth-Grade Incidents With CH**

JL attended the ninth and tenth grades at Somers Central High School.  (Defs. R. 56.1 Stmt. ¶ 2.)  During the ninth grade, student CH commented that JL was not "black enough."  (*Id*. ¶ 3.)  CH made comments to JL more than five times during the ninth grade, although JL does not remember

---

[1]  The student actors and related parties herein are referred to by pseudonym.

1

those comments with specificity. (*Id.* ¶¶ 4-5.) JL did not complain to anyone at his school regarding any of those comments. (*Id.* ¶ 7.)

## II.    Tenth-Grade Incidents With CH

In tenth grade, CH crumpled up JL's homework and called him a "nigger" during Mr. Dono's social studies class (the "Social Studies Incident"). (*Id.* ¶ 8.) JL does not remember the exact words that Mr. Dono used to respond to CH, but believes that Mr. Dono said, "you shouldn't say those things." (JL Dep. at 33.) After class, JL told Mr. Dono that he should have done more. (Defs. R. 56.1 Stmt. ¶ 10.) JL recalls several other occasions on which CH used the word "nigger." (*Id.* ¶ 11.)

## III.    Cafeteria Incident

In October 2004, in the school cafeteria, student MC and student L approached JL's lunch table and shook hands with everyone seated at the table, except JL and JL's friend, KF. (*Id.* ¶¶ 12-13.) During this encounter, L hit JL in the back of the head approximately twelve times, MC told JL that he was not being a "good nigger" and MC grabbed JL's chair, causing JL to fall to the ground (the "Cafeteria Incident"). (*Id.* ¶¶ 14-16.)

Before the Cafeteria Incident, JL had several racial incidents with both MC and L, but he never told anyone at the school of those incidents. (*Id.* ¶¶ 17-18, 20-21.) JL did not have any further racial incidents with either MC or L after the Cafeteria Incident. (*Id.* ¶¶ 19, 22.)

Immediately following the Cafeteria Incident, JL exited from the cafeteria and entered the boys' bathroom, where he punched a wall. (*Id.* ¶¶ 23-24.) As a result of punching the wall, JL hurt his hand and went to the school nurse. (*Id.* ¶ 25.) While at the nurse's office, JL spoke with Student

2

Resource Officer Trooper Todd Williams.  (*Id.* ¶ 26.)  Williams testified that, at that time, JL told him that he was upset with some of his friends because they were "getting on his case . . . [not understanding] where [he] came from," which Williams understood to mean that JL believed he was being called a "wannabe."  (Defs. R. 56.1 Stmt. ¶¶ 27-28 (*quoting* Williams Dep. at 15).)[2]  At some point during JL's conversation with Williams in the nurse's office, JL's mother, DT, arrived.  (Defs. R. 56.1 Stmt. ¶ 29.)  Williams discussed the Cafeteria Incident with DT and asked her if she would like to file a complaint.  (*Id.* ¶ 30.)  DT declined to file a complaint at that time.  (*Id.* ¶ 31.)

## IV.    Investigation Into the Cafeteria Incident

The day after the Cafeteria Incident, DT contacted the school by telephone and spoke with Perrella, the acting school principal.  (Defs. R. 56.1 Stmt. ¶ 32.)  Perrella testified that DT "made general statements about her son's feeling traumatized and . . . [that Perrella] needed to be aware of it and . . . the atmosphere of the school."  (Perrella Dep. at 31-32.)  Perrella further testified that, after asking DT if there was anything specific that DT wanted her to do, DT answered that she "did not want to press the matter further."  (Defs. R. 56.1 Stmt. ¶ 33 (*citing* Perrella Dep. at 32-33).)[3]

Following that call, Perrella states that she conducted an investigation into the Cafeteria Incident.  (Defs. R. 56.1 Stmt. ¶ 34.)  Perrella spoke separately with Siddhartha Soni, a teacher who

---

[2]  Plaintiffs dispute this statement.  (Pls. R. 56.1 Stmt. ¶ 27.)  Defendants' statement, however, is supported by Williams's deposition testimony.

[3]  Plaintiffs dispute this, arguing that it "is belied by the letter that [Perrella] received a week later from [] DT complaining that nothing was being done."  (Pls. R. 56.1 Stmt. ¶ 34.)

was supervising the cafeteria during the time of the incident,[4] JL's guidance counselor and Williams. (*Id*. ¶¶ 36-38.)  Perrella learned from Soni that the students involved in the Cafeteria Incident regularly sat and joked around with JL (Perrella also observed JL sitting with the same group of students);[5] Perrella learned from JL's guidance counselor that JL had not complained of the Cafeteria Incident; and Perrella obtained from Williams all information that "he had regarding the Cafeteria Incident."  (*Id*. ¶¶ 37-38, 40-41.)  Perrella's investigation yielded no indication that MC or L used the word "nigger" during the Cafeteria Incident.  (*Id*. ¶ 42.)[6]  Perrella discussed the findings of her investigation with principal Horisk.  (*Id*. ¶ 43.)  Based on her findings regarding the Cafeteria Incident, Perrella took no disciplinary action against MC or L.  (*Id*. ¶ 44.)

Plaintiffs state that, following the Cafeteria Incident, DT sent a letter dated October 27, 2004 to Perrella, in which DT asked defendants to pledge to protect her son and other students from discrimination and violence.  (Hoffman Decl. ¶¶ 45-46 (*citing* Pls. Mem. Opp. Summ. J., Ex. A).)  Plaintiffs also state that JL wrote a letter to the School on January 7, 2005, in which he stated that

---

[4]  Plaintiffs point out that Kevin Fernandez ("KF"), who was present during the Cafeteria Incident, stated that it would have been impossible for teachers not to hear or see the incident.  (Pls. R. 56.1 Stmt. ¶ 36.)  However, this does not contradict Perrella's statement that she interviewed Soni.

[5]  Plaintiffs dispute this statement, however, they offer no citation that supports the argument that this group did not sit together at lunch.  (Pls. R. 56.1 Stmt. ¶¶ 37-38.)  Plaintiffs also contend that "sitting with the same group of students does not preclude the occurrence of racially motivated incidences."  (*Id*. ¶ 38.)  This contention does not contradict defendants' statement that this group sat together.

[6]  Plaintiffs dispute this, however, they offer no citation supporting the argument that Perrella did not reach this conclusion.  (Pls. R. 56.1 Stmt. ¶ 42.)  Plaintiffs aver that DT and JL sent letters to the school regarding the Cafeteria Incident.  (*Id*.)  Plaintiffs also aver that defendants "had notice of the racially offensive conduct directed at JL by CH before the Cafeteria Incident," however, they provide no citation that would support such a conclusion.  (*Id*.)

4

he "was a target of a hate crime and still [was] being racial[ly] discriminated against" and asked that the school "write [him] a pledge saying that [it] will protect [him] and [his] rights." (Hoffman Decl. ¶¶ 48-49 (*citing* Pls. Mem. Opp. Summ. J. Ex. B).)  Plaintiffs state that defendants did not respond to these letters.  (Hoffman Decl. ¶ 49.)  Plaintiffs further state that, on January 30, 2005, DT wrote a letter to the Board of Education "expressing her displeasure and disbelief that [it] had not acknowledged [JL's] letter," but the Board of Education never responded to this letter.  (*Id*. ¶ 50 (*citing* Pls. Mem. Opp. Summ. J., Ex. C).)

## V.     **Defendant Perrella's Informal Observations**

In addition to conducting her investigation, Perrella avers that she observed JL on a regular basis.  (Defs. R. 56.1 Stmt. ¶ 45.)[7]  During those observations, she saw him seated at the lunch table with the same group of students involved in the Cafeteria Incident.  (Defs. R. 56.1 Stmt. ¶¶ 45-46.)  Perrella also observed JL in his classes and, based on her observations, concluded that JL seemed to be "doing well in school and comfortable."  (*Id*. ¶¶ 47-48.)

## VI.    **JL's First Suspension and JL's Participation on the Track Team**

Early in the spring 2005 semester, JL was suspended from School for stealing a computer mouse from the school library's computer lab.  (*Id*. ¶ 49.)  During his suspension, which he served in school, DT met with Horisk.  (*Id*. ¶ 50.)  At that meeting, Horisk suggested that JL participate in

---

[7]  Plaintiffs dispute this statement and argue that there is no documentary evidence to support Perrella's alleged informal observations of JL.  (Pls. R. 56.1 Stmt. ¶ 45.)

5

school activities, such as track, which might make JL feel more comfortable at school.  (*Id*. ¶ 51.)[8]

JL "thought it was a good idea" and did join the track team, later stating that he was "happy that he

played."  (*Id*. ¶¶ 53-54.)[9]


## VII.    Locker Room Theft and JL's Second Suspension

In May 2005, Williams conducted an investigation of a theft that had occurred in a locker

room at the school.  (Defs R. 56.1 Stmt. ¶¶ 55-56.)  Williams concluded that JL and his friend,

fellow student KF, had broken into the lockers using bolt cutters, while student CO kept a lookout.

(*Id*. ¶¶ 56-58.)   The lockers contained cell phones, iPods and calculators.  (*Id*. ¶ 59.)  Horisk

confronted JL about the locker room theft and JL admitted his involvement.  (*Id*. ¶¶ 60-61.)[10]

Following a superintendent's hearing regarding the theft, JL, KF and CO were suspended for

one month.  (Defs. R. 56.1 Stmt. ¶¶ 62-63.)  During this suspension, which JL served at home, the

School provided JL with tutoring and JL passed all of his classes.  (*Id*. ¶¶ 64-65.)  JL left Somers

High School and attended the eleventh and twelfth grades at Carmel High School.  (*Id*. ¶ 66.)  JL

returned to Somers High School to attend the school prom, at the invitation of some of his friends.

(*Id*. ¶ 67.)

_____

[8]  Plaintiffs dispute this statement, averring that DT has a "widely varying stor[y] on this
meeting," however, plaintiffs provide no citation that supports this contention.  (Pls. R. 56.1
Stmt. ¶ 50.)

[9]  Plaintiffs dispute this statement, arguing that plaintiffs and their experts "concluded that
the issue of helping JL join the track team is specious as it related to a remedy for the racially
charged hostile education environment JL was forced to endure."  (Pls. R. 56.1 Stmt. ¶ 53.)

[10]  Plaintiffs aver that JL committed the theft because of "[d]efendants' deliberate
indifference to the racially charged hostile school environment."  (Pls. R. 56.1 Stmt. ¶ 61.)

## DISCUSSION

### I.   <u>Legal Standard</u>

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof. . . .  The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial. . . .  A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial. . . .  The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment.

*Brooks v. Di Fasi*, 1997 U.S. Dist. LEXIS 11162, at *6-7 (W.D.N.Y. July 30, 1997) (internal

quotation marks omitted and citations omitted).


## II.   <u>Title VI Claim</u>

Title VI of the Civil Rights Act of 1964 ("Title VI") prohibits programs that receive federal

funding[11] from discriminating on the basis of race. 42 U.S.C. § 2000(d).[12]   Where the alleged

discrimination is predicated upon student-on-student harassment, as it is here, Title VI provides for

liability only where the educational institution is "deliberately indifferent . . . to such an extent that

the indifference can be seen as racially motivated." *Rodriguez v. N.Y. Univ.*, 2007 WL 117775, at

*6 (S.D.N.Y. Jan. 16, 2007) (internal quotation marks and citation omitted); *see also Gant*, 195 F.3d

at 140.

To prevail on a hostile educational environment claim under Title VI, the plaintiff must show

that the school "1) had actual knowledge of, and 2) was deliberately indifferent to 3) harassment that

---

[11]  In a Title VI action, "[t]he proper defendant . . . is the entity that receives federal financial assistance." *Kelly v. Rice*, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005).  It is well settled that a defendant cannot be sued in his individual capacity under Title VI because he is not the entity receiving the financial assistance. *Id.*; *see also Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007) ("As a threshold matter [noting] that Title VI claims cannot be asserted against an individual defendant because the individual is not the recipient of the federal funding.").  While plaintiffs direct the Court to two cases that, plaintiffs claim, support a finding of individual liability, *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134 (2d Cir. 1999); and *Peters v. Molloy Coll. of Rockville Ctr.*, 2008 WL 2704920, at *7-8 (E.D.N.Y. July 8, 2008), neither case recognizes individual liability under Title VI.  Indeed, no Title VI claim was made in *Gant* and *Peters* concedes that, while individuals may be held liable under Title VI in their official capacities, "it is well-established that individuals are not subject to liability under Title VI in their individual capacities."  2008 WL 2704920 at *8.

[12]  Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies to all programs receiving federal funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

was so severe, pervasive and objectively offensive that it 4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Rodriguez*, 2007 WL 117775, at *6 (internal quotation marks and citation omitted); *see also Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Gant*, 195 F.3d 140; *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 359 (S.D.N.Y. 2005).

### A.      Actual Notice

Actual notice of harassment is a predicate to a finding of hostile educational environment liability. *Gebser*, 524 U.S. at 274-75 (holding that constructive notice is insufficient for a finding of liability). While actual notice of every single event is not required, "in light of *Gebser*, [] the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000).

### 1.      Ninth-Grade Incidents With CH

Plaintiffs allege that CH made racially derogatory comments to JL while he was in the ninth grade. Apart from those comments, JL does not remember any other racially derogatory comments directed at him that year. (JL Dep. at 24-25.) JL admits that, while in the ninth grade, he told neither his mother nor his teachers of the racially derogatory comments. (*Id*. at 25.) Based on JL's admission, no reasonable jury could find that the defendants had knowledge of a racially hostile

9

educational environment during JL's ninth grade year.[13]

## 2.  Tenth-Grade Incidents, Not Including the Cafeteria Incident

Plaintiffs allege that defendants had notice of a racially hostile educational environment following the Social Studies Incident, which occurred while JL was in the tenth grade.  As a preliminary matter, although plaintiffs repeatedly refer to Mr. Dono, the teacher present during the Social Studies Incident, as "defendant Dono" (*see, e.g.*, Pls. Mem. Opp. Summ. J. at 30), Dono is not a defendant to this action.  Thus, in order to find that defendants were on notice of the Social Studies Incident, the fact finder would require some indication that an individual with knowledge of the event notified defendants.  There is no indication in the record that defendants were ever so informed.  Indeed, plaintiffs concede that "Dono failed to follow [district] protocol, which would be to contact other administrators and speak to other staff." (*Id*. at 18.)  As Title VI requires actual notice, the principle of *respondeat superior* will not impute Dono's knowledge of the Social Studies Incident to defendants.  *See Gebser*, 524 U.S. at 275-76.  Based on a record devoid of any evidence

---

[13]  Plaintiffs submit the affidavit of Marc E. Weiler, Ph.D., who states that he was involved in a "separate student disciplinary matter with a separate mixed race student, CO, in the Somers Central School District, in February and March 2004." (Weiler Aff. ¶ 15.) Weiler has not been identified as an expert and no deposition of Weiler has been presented. In his affidavit, Weiler included emails that he claims CO's father sent to the school regarding racial hostility. Weiler also offers his opinion that there was a hostile racial environment at the school. Apparently, plaintiffs present this affidavit to establish that defendants were on notice of such an environment at the school as early as February 2004, that is, while JL was in the ninth grade. Neither CO nor his father are parties to this action and nothing in Weiler's affidavit suggests that he has any personal knowledge surrounding the events that give rise to the case now before this Court.  Further, the statements in Weiler's affidavit are hearsay and, therefore, it is improper for this Court to consider them on a motion for summary judgment. *See Woods v. Newburgh Enlarged City School Dist.*, 2008 WL 3841497, at *1 (2d Cir. Aug. 12, 2008); *and Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (hearsay is not competent evidence and, thus, cannot be considered on a summary judgment motion).

suggesting that anyone informed defendants of any facts regarding the Social Studies Incident, no reasonable jury could find that defendants had actual notice of a racially hostile educational environment arising therefrom.

Plaintiffs also allege that, prior to the Cafeteria Incident, JL had encounters with MC and L, which he perceived to have racial overtones.  However, JL never notified anyone at the school of any of those encounters.  (JL Dep. at 64, 70.)  Thus, in light of the record, no reasonable jury could find that, based on these tenth-grade incidents, defendants had any actual knowledge sufficient to put them on notice of a racially hostile educational environment.

### 3.      Defendants Were on Notice After the Cafeteria Incident

Immediately following the Cafeteria Incident, which took place in October 2004, JL went to the nurse's office, where he spoke to Williams about the Cafeteria Incident and, thereafter, Perrella spoke with DT regarding the same.  DT alleges that, during her conversation with Perrella, the question of whether the incident was a "racial incident" was discussed.  (DT Dep. at 75.)  Plaintiffs allege that, following these conversations, they sent letters to defendants regarding the handling of the Cafeteria Incident and claiming that racial discrimination was occurring at the school.  Plaintiffs allege that they mailed three different letters, one from DT on October 27, 2004, one from JL on January 7, 2005 and one from DT on January 30, 2005.

Both plaintiffs and defendants set forth arguments regarding the significance of these letters. Plaintiffs, inexplicably, direct the Court to the "mailbox rule," the Uniform Commercial Code ("U.C.C.") and the Restatement Second of Contracts in support of the argument that defendants "accepted" the plaintiffs' letters.  (Pls. Mem. Opp. Summ. J. at 21.)  The notion that the mailbox

rule, which is a contract formation rule that dates the acceptance of an offer to enter into a contract at the moment of dispatch by the offeree, somehow applies to "constitute[] acceptance [of letters] and notice on behalf of the [d]efendants" in a Title VI case, which makes no contract claim whatsoever, is novel. (*Id*.) Indeed, defendants do not cite any supporting legal authority. To the extent plaintiffs ask this Court to extend the mailbox rule, the U.C.C. or the Restatement Second of Contracts to establish notice in a Title VI case, we decline to do so.

Defendants contend that these letters are "hearsay." (Defs. Mem. Supp. Summ. J. at 4.) A statement is hearsay only if it is offered to prove the truth of the matter asserted therein. FED. R. EVID. § 801(c). The letters in this case are not hearsay because plaintiffs offer them not to prove the *truth* of the matter asserted therein, but rather to prove that defendants were on *notice* of the matter asserted therein. Thus, contrary to defendants' assertion, the letters are not hearsay.

Notwithstanding the creative legal arguments set forth by both parties, the Court finds that, based on JL's conversation with Williams, DT's conversation with Perrella and the three letters sent by plaintiffs, the mailings of which we accept as true for the purposes of this motion, defendants were on notice of racial hostility as of October 2004.

### B.   <u>Deliberate Indifference</u>

Deliberate indifference is "found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances . . . and when remedial action only follows after a lengthy and unjustifiable delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003), *citing Gant*, 195 F.3d at 141; *and Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998) (internal quotation marks omitted). As defendants

did not have notice of plaintiffs' allegations of a hostile educational environment until after the Cafeteria Incident, which happened in October 2004, deliberate indifference could only be found to have occurred with respect to their response to the Cafeteria Incident or other incidents that occurred subsequent to the Cafeteria Incident.

Plaintiffs claim that defendants responded with deliberate indifference to the Social Studies Incident. (Pls. Mem. Opp. Summ. J. at 22.) However, plaintiffs do not allege that any defendant was involved in the Social Studies Incident (the Court again notes that Dono is not a defendant to this action), that any defendant was asked to respond to the incident or that any defendant was even informed of the incident. (*See id.*, "Dono [did not] . . . contact other administrators [or] speak to other staff.") Dono's response to the Social Studies Incident, the adequacy thereof or even the total lack thereof, will not impute deliberate indifference to the defendants. *See Davis*, 526 U.S. at 642 ("we [reject] the use of agency principles to impute liability to the district for the misconduct of its teachers . . . [r]ather we [conclude] that the district could be liable for damages only where the district itself intentionally acted [with] . . . deliberate[] indifferen[ce] . . . . "). As a matter of law, we cannot agree with plaintiffs' contention that "[t]he fact that [] Dono witnessed the incident with CH and chose to do nothing satisfies the requirement that the [d]efendant[s] must have acted with deliberate indifference." (Pls. Mem. Opp. Summ. J. at 22.)

Plaintiffs further contend that defendants' response was "deliberately indifferent with regard to the [C]afeteria [I]ncident itself." (*Id*. at 23.) It is undisputed that, immediately following the incident, (1) Williams met with JL, (2) JL's mother, DT, was called into the School to discuss the Cafeteria Incident, (3) Perrella and DT had a telephone conversation regarding the Cafeteria Incident and (4) Perrella conducted an investigation of the incident. Likewise, it is undisputed that, in the

13

months following the Cafeteria Incident, Horisk met with DT to discuss JL's progress in school. While the content of the conversations and the recommendations made therein are disputed, the fact that they occurred is not.

"[D]eliberate indifference must, at a minimum, cause [students] to undergo harassment or make them . . . vulnerable to it." *Davis*, 526 U.S. 645 (internal quotation marks and citations omitted; alterations in original). JL testified that, following the Cafeteria Incident, he had no "racial incidents" with either MC or L. (JL Dep. at 63, 71.) Further, to the extent plaintiffs argue that Perrella's disciplinary decision regarding MC and L amounts to deliberate indifference, courts have been skeptical of arguments premised on the degree to which a school punishes its students. The Supreme Court has rejected the argument that "victims of peer harassment . . . have a [Title VI] right to make particular remedial demands" on the school and cautioned that Title VI does not "require funding recipients to 'remedy' peer harassment . . . [o]n the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. 648-49. The Supreme Court further recognized that "[s]chool administrators will continue to enjoy the flexibility they require" and that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id*.

Because the question here is not whether the School responded at all, but the adequacy of its response, this Court, as instructed by the Supreme Court, finds it appropriate to give deference to the School's disciplinary judgment with regard to the Cafeteria Incident. While the Court is mindful that granting summary judgment is a decision not to be made lightly, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id*. Given the undisputed

14

facts that defendants engaged in some forms of investigation into the Cafeteria Incident, even though plaintiffs may have been dissatisfied with the outcome, and the fact that JL was never again subjected to harassment by MC or L, this Court finds that defendants' response was not so deliberately indifferent as to be clearly unreasonable.

Plaintiffs also contend that defendants' decision to suspend JL following a hearing regarding the locker room theft constituted deliberate indifference. In support of this argument, plaintiffs offer the expert testimony of Dr. Milton C. Hollar, who concludes that there was "a clear psychological path from the accumulated rage and anger toward the perpetrators of the racial acts against JL, the institutional acceptance of the racist behavior and the act of taking things from the lockers." (Pls. Mem. Opp Summ. J., Ex. I at 7.)  The Court recognizes the logic in these arguments and is not unwilling to accept the possibility that acts of racial hostility could give rise to behavior problems in adolescents.  However, to support a Title VI claim against defendants, plaintiffs must still show that the School was deliberately indifferent to racial hostility and, as discussed above, plaintiffs have not proffered sufficient evidence to support such a claim.  With regard to the decision to suspend JL, the record indicates that defendants carefully considered the relevant evidence and their resolution of the matter was not the result of deliberate indifference.  Plaintiffs appealed the suspension and it was affirmed once by the Superintendent and then again by the Commissioner of the New York State Education Department, who noted that, although JL "introduced the testimony of a psychologist who explained that JL's participation in the 2005 theft was motivated by his anger and frustration over the 2004 assault and [the Superintendent's] failure to adequately address the situation," JL's one-month suspension was nonetheless "warranted" based on the school's "code of conduct." (Rivera Reply Decl., Ex. A at 2.) The Commissioner also "reject[ed] [plaintiffs'] argument that [defendants]

15

failed to consider relevant mitigating evidence" in deciding to suspend plaintiff for one month. (*Id.*) While this Court appreciates the points made by Dr. Hollar, the record is clear that defendants fully considered JL's situation and, thus, were not "deliberately indifferent" to it.

Because defendants were not deliberately indifferent to a racially hostile educational environment, plaintiffs' Title VI claims cannot withstand the instant motion for summary judgment.

### III.   <u>Section 1983 and Equal Protection Claims</u>

In addition to plaintiffs' Title VI claim, plaintiffs also bring claims under § 1983, alleging the same facts that give rise to their Title VI claim. (Am. Complt. ¶¶ 66-77.) It is well established that § 1983 does not create a substantive right, but rather "provides the procedural mechanism through which a plaintiff may bring a suit for violation of a federal right" that would otherwise remain unremedied. *Bruneau*, 163 F.3d at 756. However, it is not available for violations of all federal statutes. *Id*. The Supreme Court has been clear that, where Congress has enacted statutes that redress the violation of a federal right with sufficiently comprehensive enforcement schemes, those statutes will "supplant any remedy that would otherwise be available under § 1983." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).

Therefore, the operative question is whether Title VI is sufficiently comprehensive as to preclude a plaintiff who brings a Title VI claim from bringing a claim under § 1983 where the same facts underlie both claims. Courts in the Second Circuit have clearly and uniformly answered in the affirmative, finding Title VI to supplant § 1983 in such cases. *Mislin v. City of Tonawanda Sch. Dist.*, 2007 WL 952048, at *12, n.16 (W.D.N.Y. Mar. 29, 2007) ("race-based equal protection claims are [] subject to dismissal because they are subsumed by their Title VI claims"); *Kamal v. Hopmayer*,

2006 WL 3197161, at *5 (S.D.N.Y. Nov. 2, 2006) ("Title VI contains a sufficiently comprehensive scheme so as to foreclose the use of § 1983 to implement its provisions.") (internal quotation marks and citations omitted); *Bayon v. State Univ. of N.Y.*, 2001 WL 135817, at *3 (W.D.N.Y. Feb. 15, 2001) ("Where Congress has established enforcement mechanisms containing remedial devices that are sufficiently comprehensive, as it has done with Title VI . . . those enforcement mechanisms may not be bypassed by bringing suit under Section 1983.").

  As it is well established that Title VI provides a sufficiently comprehensive enforcement scheme, the Court now turns to plaintiffs' argument that their § 1983 claims survive because they are based, in part, on the Equal Protection Clause of the Fourteenth Amendment.  (Pls. Mem. Opp. Summ. J. at 28.)  Plaintiffs do not direct the Court to any legal authority in support of their argument on this point.  The Second Circuit has held that a § 1983 claim based on the Equal Protection Clause is subsumed by a sufficiently comprehensive enforcement scheme, stating that it "recogniz[es] no constitutional rights exception to the *Sea Clammers* doctrine."  *Bruneau*, 163 F.3d 758 (finding that Title IX has a sufficiently comprehensive enforcement scheme as to preclude a § 1983 based on the Equal Protection Clause), *construing Middlesex County Sewerage Auth.*, 453 U.S. 1.  Plaintiffs' Equal Protection claim is based on the same factual predicate as their Title VI claim.  (*See* Am. Complt. ¶¶ 66-77.)  As Title VI's enforcement scheme is sufficiently comprehensive, plaintiffs' § 1983 claim based on the  Equal Protection Clause and predicated on the same facts as their Title VI claim is subsumed by the Title VI claim.

  Put simply, plaintiffs have already invoked the comprehensive enforcement scheme in Title VI as a means to redress the same alleged violations of federal rights that underlie their § 1983 claims.  The Title VI claim, thus, subsumes their § 1983 claims and, therefore, plaintiffs' § 1983

claims cannot withstand the instant motion for summary judgment.  Thus, the Court need not consider the parties' arguments regarding *Monell*.

### A.    <u>Individual Liability Under § 1983</u>

As described above, Title VI does not apply to individual defendants in their individual capacities.  While it is clear in the Second Circuit that Title VI subsumes § 1983 claims against institutional defendants, the Circuit has declined to "address the extent to which [Title VI] subsumes a § 1983 claim against [] individual defendants" and there is no consensus among the district courts in this Circuit regarding whether Title VI subsumes § 1983 claims against individual defendants in their individual capacity.  *Bruneau*, 163 F.3d at 755.  *Compare Bayon*, 2001 WL 135817, at *3 (dismissing § 1983 claims against individual defendants because the claims were based on the same facts as plaintiff's Title VI claim) *with Hayut v. State Univ. of N.Y.*, 127 F. Supp. 2d 333, 339-40 (N.D.N.Y. 2000) (declining to dismiss § 1983 claims against individual defendants because individual "defendants are not amenable to suit under [Title VI], so it cannot be said that [Title VI] provides [plaintiffs with a] comprehensive remedy as against the individual defendants").  Assuming, without deciding, that Title VI's remedial scheme is not sufficiently comprehensive to preclude plaintiffs from bringing § 1983 claims against the individual defendants in their individual capacities, the Court now turns to the question of whether the individual defendants are shielded from § 1983 liability based on qualified immunity.

A public officer will be shielded from liability for damages stemming from the performance of discretionary official functions, provided that his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v.*

18

*Fitzgerald*, 457 U.S. 800, 818 (1982).  In opposition to defendants' argument that the individual defendants should be granted qualified immunity, plaintiffs submit that "an abundance of evidence [] shows that the individual [d]efendants violated the [p]laintiffs' constitutional rights to be free from racial discrimination.  For example, [p]laintiff JL was subjected to beatings from other students, racial slurs and verbal abuse in the presence of school officials." (Pls. Mem. Opp. Summ. J. at 29.) Apart from this "example," plaintiffs do not direct this Court to the "abundance of evidence" and there is no indication from the record that any individually named defendant was present while "JL was subjected to beatings . . . racial slurs [or] verbal abuse." (*Id.*).

Defendant Clinchy, President of the School's Board of Education, is not mentioned anywhere in plaintiffs' opposition papers to this motion.  In light of a record devoid of any allegation that Clinchy acted in a way that was objectively unreasonable, Clinchy is entitled to qualified immunity.

Defendant Marien, Superintendent of Schools, is referred to only with respect to her decision to suspend JL.  Thus, the question is whether Marien's decision to suspend JL, a decision that was within her discretion as Superintendent of Schools and made after a superintendent's hearing, was objectively unreasonable.  While plaintiffs remain displeased with the outcome of that hearing, this Court cannot rule as a matter of law that Marien's conduct in her official capacity and in employing her discretion to suspend a student who had committed two thefts at the school was objectively unreasonable.  Therefore, Marien is entitled to qualified immunity.

Defendant Perrella, who was the acting principal during the Cafeteria Incident, is referred to only with respect to her response to the Cafeteria Incident.  While plaintiffs aver that she mishandled the Cafeteria Incident, it is undisputed that she engaged in some form of investigation.  There is no evidence from the record that Perrella acted outside the scope of her employment and no evidence

19

from which to infer that her conduct was objectively unreasonable.  Accordingly, Perrella is entitled to qualified immunity.

Defendant Horisk, principal of the School, was on leave during the Cafeteria Incident and, upon her return, was advised by Perrella of the Cafeteria Incident and Perrella's response to it.  The only conduct germane to this action occurred when (1) Horisk suggested that JL join the track team and (2) Horisk confronted JL regarding the locker room thefts and JL admitted that he was involved.  Following that confession, Horisk referred the matter to the Superintendent, who held a hearing and decided to discipline JL with a one-month suspension.  Based on the record, there is no indication that Horisk acted outside the scope of her employment or that she acted in a way that was objectively unreasonable.  Therefore, Horisk is entitled to qualified immunity.

Because no evidence indicates that any of the individually named defendants acted in an objectively unreasonable way, each defendant is entitled to qualified immunity and, thus, no claim against any defendant in his or her individual capacity can withstand the instant motion for summary judgment.

## IV.    State and New York Human Rights Law Claims

Plaintiffs also bring state law claims of intentional infliction of emotional distress, negligent supervision, assault, battery, negligence *per se* and violations of New York State Human Rights Law ("NYHRL").  Section 3813 of the New York State Education Law requires that a Notice of Claim be filed within ninety days of the alleged act of discrimination.  "It is well-settled that compliance with Education Law § 3813 is a condition precedent to commencement of an action against a school board, its members or employees."  *Grennan v. Nassau County*, 2007 WL 952067, at *17 (E.D.N.Y.

Mar. 29, 2007.)  And the New York Court of Appeals has been clear that "no action or proceeding may be prosecuted or maintained against any school district or board of education unless a notice of claim has been presented to the governing body and [a] court may not disregard [this] pronouncement."  *Parochial Bus Sys., Inc. v. Bd. of Educ.*, 60 N.Y.2d 539, 547 (1983) (internal quotation marks and citation omitted).  It is undisputed that, in the instant case, plaintiffs have filed no Notice of Claim on their state law or NYHRL claims.  Defendants argue that, for this reason, those claims should be dismissed.  Plaintiffs counter that this Court should use its discretion to grant plaintiffs the right to file a late Notice of Claim.  N.Y. EDUC. LAW § 3813(2-a).

> Upon application, the court, in its discretion, may extend the time to serve a notice of claim.  The extension shall not exceed the time limited for the commencement of an action by the claimant against any district or any such school.  In determining whether to grant the extension, the court shall consider, in particular, whether the district or school or its attorney . . . acquired actual knowledge of the essential facts constituting the claim [as well as] . . . all other relevant facts and circumstances, including: whether the claimant was an infant, . . .; and whether the delay in serving the notice of claim substantially prejudiced the district or school in maintaining its defense on the merits.

*Id*.  Plaintiffs do not provide the Court with any reason for their lengthy delay in seeking leave to file a late Notice of Claim and, while plaintiffs note that JL was a minor during the relevant time period, the Court notes that DT, his co-plaintiff, was an adult at all times relevant to this proceeding.

Still, the Court need not address the merits of plaintiffs' application for leave to file a late Notice of Claim because the Court lacks jurisdiction to grant such a request even if the request had merit.  Section 3813(2-a) states that an "extension shall not exceed the time limited for the commencement of an action."  Thus, if the applicable statute of limitations has expired, a court may not grant a party leave to file a late Notice of Claim.  *See Meyer v. William Floyd Union Free Sch. Dist.*, 2008 WL 4415271, at *9 (E.D.N.Y. Sept. 24, 2008); *see also Munro v. Ossining Union Free*

*Sch. Dist.*, 2008 WL 4594729, at *1 (N.Y.A.D. 2d Dep't Oct. 14, 2008) ("If the . . . statute of

limitations . . . has not run, a claimant may seek permission to serve a late notice of claim.").  "To

permit a court to grant an extension after the Statute of Limitations has run would, in practical effect,

allow the court to grant an extension which exceeds the Statute of Limitations, thus rendering

meaningless that portion . . . which expressly prohibits the court from doing so." *Pierson v. City of

New York*, 56 N.Y.2d 950, 955 (1982).

Here, plaintiffs filed the instant request to serve a late Notice of Claim in their response

papers, dated October 8, 2008.  (Pls. Mem. Opp. Summ. J. at 30.)  While neither party has addressed

the issue of the statute of limitations, viewing the facts in the light most favorable to plaintiffs, it

appears that their state and NYHRL claims arose, at the latest, in June 2005, which was the end of

DT's final school year at Somers High School.  The statute of limitations for any action brought

involving the rights or interests of any school is one year.  N.Y. Educ. Law § 3813(2-b); *see also

Munro*, 2008 WL 4594729, at *1; *and Henry Boeckmann, Jr. & Assocs., Inc. v. Bd. of Educ.*, 616

N.Y.S.2d 395, 397 (2d Dep't 1994).  Accordingly, this Court's jurisdiction to consider plaintiffs'

application to file a late Notice of Claim ended in June 2006.

Plaintiffs next argue that the Notice of Claim requirement does not apply because the

individual defendants were "not acting within the scope of their public employment."  (Pls. Mem.

Opp. Summ. J. at 30.)  The Court presumes that plaintiffs argue that the Notice of Claim requirement

does not apply to conduct committed by the individual defendants in their individual capacities

because the Notice of Claim is a condition precedent only to actions "against a school board, its

members or employees."  *Grennan*, 2007 WL 952067, at *17.  This Court recognizes that, to the

extent the individual defendants acted outside the scope of their employment, they may be sued in

tort without first having been served with a Notice of Claim. However, plaintiffs set forth no evidence from which to infer that the individual defendants acted outside the scope of their employment and, as this Court has already discussed with respect to the qualified immunity issue, each individual defendant acted well within the bounds of his or her employment.

None of plaintiffs' state law or NYHRL claims are sufficient to withstand the instant motion for summary judgment because: (a) plaintiffs have failed to file a Notice of Claim, a prerequisite to their state law and NYHRL claims; (b) the time within which this Court would have discretion to grant leave to serve a late Notice of Claim has passed; and (c) plaintiffs have set forth no indication that the individual defendants were acting outside the capacity of their employment so as to render the Notice of Claim requirement inapplicable.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. #28) is granted in its entirety. The action is dismissed with prejudice and without costs or attorneys' fees. The Clerk's Office is directed to enter judgment in favor of defendants.

SO ORDERED.

Dated: White Plains, New York
       November 24, 2008

                                      *William C. Conner*
                                      Sr. United States District Judge